UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X

UNITED STATES OF AMERICA,

      -   against –                         23 CR 292 (RPK)

JARRETT BRUCE,

                 Defendant.

--------------------------------------------------------------- X

## SENTENCING MEMORANDUM OF DEFENDANT JARRETT BRUCE

Defendant Jarrett Bruce, ("Mr. Bruce" or "Jarrett") through his undersigned counsel, respectfully submits this Sentencing Memorandum for the Court's consideration in connection with his sentencing scheduled for August 3, 2026 at 12:30 p.m. In light of all of the factors enumerated in 18 U.S.C. § 3553(a), discussed in more detail below, defense counsel respectfully requests that the Court impose a below-Guidelines sentence of ten years. Such a sentence would address the Court's mandate to impose a sentence which is "sufficient, but not greater than necessary" to meet the goals of the Sentencing Reform Act.

Mr. Jarrett Bruce is a forty-two-year-old man who stands before this Court with a life sentence hanging over his head. The driver of the lengthy sentence to which Mr. Bruce is subject is the Sentencing Guidelines' base offense level, 32, for kidnapping and the 6-level enhancement for demanding a ransom for the victim's release. Whether this Court believes Mr. Bruce is innocent or not of the kidnapping described at trial, what is indisputable is that the act of kidnapping itself and the details as they emerged from trial make clear that his alleged participation in this crime was uncharacteristic of him. A cursory review of his criminal history

indicates that his convictions and pending proceedings are either for drug sales or burglaries. With respect to the latter, Mr. Bruce has never been accused of hurting victims. In fact, in looking at the description of a burglary in which Mr. Bruce was allegedly involved in or around May 23, 2017, he and accomplices allegedly fled a premises when they discovered that its owners were home. *See* Presentence Investigation Report prepared June 15, 2026 ("PSR"), ¶ 61. There is nothing in Mr. Bruce's criminal history that suggests that he is a violent man.

In light of his age and the fact that he has no history of violence, we respectfully submit that any sentence beyond ten years for a forty-two-year-old man amounts to a life sentence that is unwarranted, beyond what is necessary and deprives Mr. Bruce of any hope that he can ever return to a normal life.

## I.    <u>Background</u>

### A.    <u>Mr. Bruce's Personal History</u>

As the PSR indicates, Mr. Bruce did not cooperate with the Probation Office with respect to telling his story from childhood to the present. He has lost hope that his sad upbringing would be of any use at his sentencing. We hope his pessimism is without basis.

In a previous presentence investigation report, Mr. Bruce reported his birth year, 1993, and birthplace, Teaneck, New Jersey. *See* PSR, ¶ 28. In discussions with counsel, he confirms that fact. He also confirms that he had five siblings, he was the oldest and had two brothers and three sisters, and that he was raised at a certain period of time by his grandmother. *See id.*

There is good reason for Mr. Bruce to be reluctant about describing his childhood because it is best described as Dickensian. His mother was a crack addict who would disappear from the household for months at a time when her children were young and eventually never returned. His father was overwhelmed by both the financial burden of supporting five children

2

and himself on minimum wages (he was a car detailer) and the psychological burden of caring for five children all by himself.  Through his early childhood, Mr. Bruce, who was the oldest, and his siblings were severely impoverished, suffered from food instability and lacked sufficient clothes.  By the time Mr. Bruce became a teenager, when he was about 12-13 years old, his mother had pretty much abandoned the family and his father was so depressed that he and his siblings started living with their paternal grandmother.  Mr. Bruce's paternal grandmother was not particularly happy about caring for all of these children.  She was a harsh guardian and beat them mercilessly.  Eventually, Mr. Bruce's father was diagnosed with schizophrenia and was in and out of mental hospitals throughout Jarrett's life.  It was about this time, when he and his siblings were "adopted" by the paternal grandmother, that Mr. Bruce took to the proverbial streets to hustle in order to buy himself and his sibling's clothes that were not embarrassing and other gadgets that other kids received from their parents.  Mr. Bruce also gave his paternal grandmother proceeds from his hustling in order to assist her with the support of himself and his siblings.  His paternal grandmother knew the sources of the proceeds and did not bat an eye when accepting money from him.

Eventually, Mr. Bruce and his siblings became too much for his paternal grandmother to support and handle and Child Protective Services removed them from her care because of abuse and neglect.  The children were committed to the custody and care of the Department of Social Services who separated the siblings and placed them in different foster families. Mr. Bruce described this as one of the most painful experiences of his life.  He sorely missed his sisters and brother.  The separation of Mr. Bruce from his other siblings has had a lasting effect: they remain in touch from time to time but estranged.  When Mr. Bruce was about fifteen years old until about his eighteenth year, he and one of his younger brothers were placed with a family in

3

Bridgeton, New Jersey.  Being someone accustomed to larger cities, Mr. Bruce ran away from the foster home and returned to Teaneck, New Jersey where he spent the majority of his adult life.  Upon his return to Teaneck, Mr. Bruce's father had deteriorated in terms of his mental health.  As mentioned above, he was diagnosed as paranoid-schizophrenic and spent the rest of his days either highly medicated or trying to wean himself from medication and then being subject to hallucinations that triggered involuntary commitments.  In or around 2006, Marquise, a younger brother whom Mr. Bruce loved and described as his best friend, was killed by a stray bullet on his way to the store.  Two random rival gang members were shooting at each other in the street.  Mr. Bruce was devastated by the tragic loss of his brother but he did what he had always done to survive: he just pushed the pain down.

As can be seen, from the beginning of his childhood to his young adulthood to the present day, Mr. Bruce never had the benefit of a loving or supportive father or mother.  He had barely a relationship with his remaining brother and sisters. He had no safety net; no home to return to when in need.  He was truly on his own and he did he what he did to support himself because that appeared to be the only course that was available and that he knew.

B.    **The Offense Conduct and the Plea Agreement**

The PSR describes the offense conduct at issue for Mr. Bruce's sentencing.  *See* PSR, ¶¶ 1-18.  As the court is aware, Mr. Bruce contests the allegations that resulted in his conviction by jury.  He continues to push the fact that any dispute that he had with the victim was long dissipated by the time of the events at issue.  He is confounded by the jury's conviction and can only understand it as the result of the jury hearing only limited accounts of his relationship with the victim and their mutual friends.

4

## II.    ARGUMENT

Mr. Bruce stands before the Court prepared to accept its sentence, in spite of his determination to appeal his conviction.  In considering the appropriate sentence for Mr. Bruce, we would respectfully request that the Court focus on two previously referenced facts: 1) Mr. Bruce's age of forty-two years; and 2) a criminal history that shows no indication that he had a predisposition to violence of any kind.

### A.    The Applicable Legal Standard

As the Court is well aware, the Sentencing Guidelines are advisory and while they serve as the starting point for a sentencing court's analysis, the inquiry does not end there. As noted in *Nelson v. United States*, 129 S. Ct. 890 (2009), where the Court summarily reversed the Fourth Circuit which had upheld a district court's application of a presumption of reasonableness to the guidelines: "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."  *Id.* at 892. (Emphasis in original.)  Thus, the guidelines are now only one factor to be considered in the formulation of a minimally sufficient individualized sentence.

When imposing sentence, the Court is required to consider the factors set forth in 18 U.S.C. § 3553(a)[1] in order to create an "individualized assessment" based on a defendant's particular circumstances. *Gall vs. United States*, 552 U.S. 38, 49-50 (2007); *see also United*

---

[1] The relevant factors are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed" to, inter alia: provide just punishment, deter criminal conduct, protect the public from any future crimes by the defendant, and provide the defendant with rehabilitative training and treatment; (3) "the kinds of sentences available"; (4) "the kinds of sentence and the sentencing range established" for the offense; (5) "any pertinent policy statement"; (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (7) "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a).

5

*States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *Cavera*, 550 F.3d at 188.

The Court has ample discretion to impose a below-Guidelines sentence. *See Kimbrough v. United States*, 552 U.S. 85, 101-10 (2007). In doing so, the Court may consider, and rely upon, any information available concerning the background, character, or conduct of the defendant. *See Cavera*, 550 F.3d at 189-91; *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense for which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Moreover, in making an "individualized assessment," the Court is not only empowered to impose a sentence below the Guidelines range, it is required to do so where a lower sentence would be sufficient to comply with the purposes of Section 3553(a). *See, e.g., United States v. Dorvee*, 616 F.3d 174, 183-84 (2d Cir. 2010); *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). This is consistent with the long-standing principle that a Court consider "every convicted person as an individual" and to uphold "the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).  In sum, the overarching task of a sentencing court is to fashion a sentence that is appropriate for the individual circumstances of the offense and the defendant, and is "sufficient, but not greater than necessary" to achieve the statutory goals of punishment, deterrence, and rehabilitation. 18 U.S.C. § 3553(a).

III.    <u>**Ten Years Of Prison Is An Appropriate Sentence**</u>

Analysis of the Section 3553 factors weighs in favor of a sentence of ten years for Mr. Bruce.  It is respectfully submitted that such "a sentence is sufficient but not greater than necessary" to provide just punishment.

A.    **The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

The sentence that we urge the Court to impose – a sentence of ten years – would not undermine factors that the Court must consider, such as the seriousness of the offense, promoting respect for the law and providing just punishment.

Of note with respect to these three factors is that a similarly situated defendant in the Southern District of New York was recently sentenced to ten years of prison.  *See Villar v. United States*, 2023 WL 4763204 at * (S.D.N.Y. July 25, 2023).  In *Villar*, the defendant and his coconspirators "participated in a multi-hour kidnapping where a DEA confidential informant ("Victim") was lured and dragged into a waiting automobile in the Bronx … Once inside the vehicle, the Victim was tortured and forced to transfer $15,000 from his personal bank account … Co-conspirators also demanded that an undercover officer … posing as the Victim's cousin – pay a $500,000 ransom to secure the Victim's release." *Id.* at *1.  As indicated above, Judge Crotty sentenced the defendant to only 10 years of prison.  Therefore, we respectfully submit that the ten years we ask on behalf of Mr. Bruce is clearly in line with the sentence that Judge Crotty imposed on Villar.

We would note that in *Villar*, the defendant took a plea.  Mr. Bruce should not be penalized for choosing to proceed to trial in the instant case rather than taking a plea. Courts have consistently held that a defendant should not be penalized by a higher sentence for exercising his constitutional right to proceed to trial.  *North Carolina v. Pearce,* at *397 U. S.*

*738* (opinion of Black, J.).  Although, in this case, the court was dealing with a retrial after a successful appeal, the constitutional principles remain the same.  Studies have shown that defendants who proceed to trial in federal court are often likely to be sentenced to ten to twenty years more than they would have had they taken a plea.  The so-called trial penalty has been widely confirmed by studies of federal cases and judges and the criminal trial bar have repeatedly observed this penalty and have spoken out against it.  *See* https://www.nacdl.org/Landing/TheTrialPenalty

Courts must be aware of this implicit bias.  There is a tendency to conflate judicial economy with plea bargains.  However, Mr. Bruce's decision to proceed to trial should not add to the sentence he receives.

As for the Court's consideration of a sentence that captures the seriousness of the offense at issue, we think it should consider the deplorable conditions at MDC where Mr. Bruce has been incarcerated since February of 2024 (over two years).  We are confident that the Court is familiar with the appalling conditions at MDC; nonetheless, we would like to emphasize the following.

**Persistent Lockdowns**

Prior to the Covid-19 pandemic, detainees enjoyed relative freedom to move around the facility during the day.  MCD implemented severe lockdowns to deal with the effects of the pandemic; although the pandemic started almost six years ago, Covid-related lockdowns persist to this day.  Further, in the aftermath of the pandemic. MDC has endured a well-documented staffing shortage.  The consequence of staffing shortages, especially pervasive for weekend shifts, is that inmates have restricted movement for safety reasons.  Lockdowns occur not only for COVID outbreaks but because there is not sufficient staff to permit and oversee the freedom

8

of movement of inmates.  While Mr. Bruce has been at MDC, lockdowns are frequent, if not routine.

Judges have acknowledged how lockdowns are extremely harsh and punitive.  One judge has observed that a lockdown is "tantamount to solitary or near-solitary confinement."  *See United States v. Chavez*, No. 22-CR-303 (JMF), 2024 WL 50233, at \*5 (S.D.N.Y. Jan. 4, 2024). Another judge noted that the conditions at MDC are essentially "like solitary confinement with no access to visitors for most of that time."  *See United States v. Gonzalez*, No. 18-CR-669 (JPO) (S.D.N.Y. April 2, 2021), Sentencing Tr. at 17-18, ECF No. 250.  Yet another judge has noted that these conditions "[exact] a price on a prisoner beyond that imposed by an ordinary day in prison.  Although not intended as punishment, incarceration in such conditions is, unavoidably, more punishing."  See United States v. Romero, No. 15 Cr. 445-18, 2021 WL 1518622, at \*4 (S.D.N.Y. Apr. 16, 2021).

### Violence and Corruption

Violence has been a routine part of life at MDC for many years.  In 2018, two lieutenants and an officer at MDC were convicted of raping several female inmates.  *See* Press Release, U.S. Attorney's Office, Eastern District of New York, *Federal Correctional Officer Convicted of Repeatedly Raping Female Inmate* (Jan. 19, 2018), available at: https://www.justice.gov/usao-edny/pr/federal-correctional-officer-convicted-repeatedly-raping-female-inmate.  Contraband weapons are common and often have been brought inside the facility by staff, which contributes to the dangerous conditions inside the facility.  *See United States v. Chavez*, No. 22-CR-303 (JMF), 2024 WL 50233, at 1, n.4 (S.D.N.Y. Jan. 4, 2024).

Drugs, which are as readily available inside the facility as they are outside the facility, exacerbate the already violent situation.  *See*, *e.g.*, Gov't sentencing Memo at 4, *United States v.*

*Moronta*, 17 Cr. 36 (RRM) (E.D.N.Y. June 20, 2018), ECF No. 70 ("defendant endangered the lives of his fellow correctional officers and the inmates entrusted to his care at the MDC" by "smuggling K2, a synthetic narcotic that often makes users volatile and unpredictable"); Complaint, *United States v. Joseph*, 23 Cr. 306 (DLI) (E.D.N.Y. April 14, 2023), ECF No. 1 (alleging MDC Correctional Officer smuggled in drugs, cellphones and other items to detainees in return for thousands of dollars).

While Mr. Bruce has not personally been attacked by a fellow inmate, he has lived in daily dread of being attacked by some random act of violence. His fears are warranted by the circumstances at MDC.

In 2024, Judge Brown delivered a scathing review of MDC's various failures to keep its inmates safe. He wrote in *United States v. Colucci*, the following: "Taken together, these incidents demonstrate a woeful lack of supervision over the facility, a breakdown of order and an environment of lawlessness within its confines that constitute unacceptable, reprehensible and deadly mismanagement. And these conditions bear heavily on the determination by the Court in this case." 2024 WL 3643857, at *6 (E.D.N.Y. August 4, 2024). Judge Brown proceeded to impose a more lenient sentence than he would otherwise because of the "reprehensible" conditions of MDC. We hope the Court seriously considers imposing the ten years that we seek on Mr. Bruce's behalf not only because it is in line with a sentence that Judge Crotty recently imposed on a similarly situated defendant but because Mr. Bruce's experience while incarcerated at MDC has felt very much more than the two years it has been in light of the awful conditions there.

**B.      The Need to Afford Adequate Deterrence to Criminal Conduct and Protect the Public From Further Crimes of the Defendant**

We understand that specific deterrence and/or recidivism may be a consideration over which this Court pauses in sentencing Mr. Bruce because of his lengthy criminal history.  It should be noted that the sentence we seek on behalf of Mr. Bruce – ten years – would leave him nearly a senior citizen by the time he were to be released.  It is well established that criminal offenders tend to age out of criminal activity.  By the time offenders are in their sixties upon release, the likelihood that they would recidivate dramatically decreases.  *See generally* The Effects of Aging on Recidivism Among Federal Offenders at https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders ("For offenders in Criminal History Category VI, the rearrest rate ranged from 89.7 percent for offenders younger than age 30 at the time of release to 37.7 percent for offenders age 60 or older").  Also, as noted above, it cannot be disputed that the criminal conduct for which Mr. Bruce stands accused here, kidnapping, was aberrant behavior for him.  There is nothing in his criminal history that would have predicted a turn to kidnapping or a return to it.  Any fear that the Court may harbor that Mr. Bruce would return to this sort of offense is simply not warranted.

**C.      The Need to Avoid Unwarranted Sentencing Disparities**

Title 18 U.S.C. § 3553(a)(6) describes "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Because the sentence that we seek on behalf of Mr. Bruce is exactly that of a sentence recently imposed on a similarly situated defendant by Judge Crotty there are no real concerns that the sentence we seek on behalf of Mr. Bruce raises an alarm of an unwarranted sentencing disparity.

11

**V.**     **Conclusion**

For all the foregoing reasons, Mr. Bruce respectfully requests that the Court impose a sentence of no more than ten years of prison.  We thank the Court for its consideration of our request.

Dated: July 6, 2026
       New York, New York

CARDI & EDGAR, LLP

/s/

_____

Dawn M. Cardi
99 MADISON Avenue, 8th Floor
New York, New York 10016
212.481.7770 (tel.)
212.271.0665 (fax)
dcardi@cardiedgarlaw.com

*Attorneys for defendant Jarrett Bruce*