

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JPL:JBD/LM/ADW
F. #2023R00189

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 27, 2026

<u>By ECF</u>

The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Jarett Bruce
>        <u>Criminal Docket No. 23-292 (RPK)</u>

Dear Judge Kovner:

The government respectfully submits this letter in anticipation of sentencing of Jarett Bruce, which is scheduled for August 3, 2026, at 12:30 p.m. and in response to the defendant's sentencing submission.  <u>See</u> ECF No. 292 ("Def. Ltr.").  On July 10, 2025, a jury convicted the defendant of participating in a kidnapping conspiracy, in violation of Title 18, United States Code, Section 1201(c).  The evidence at trial established that the defendant coordinated and conspired with his co-conspirators to carry out one of the most brutal crimes—a premeditated, prolonged and sadistic kidnapping, all to collect a purported debt and extract ransom.

This was not a crime that spiraled out of control in the heat of the moment.  It was planned.  It was coordinated.  And it was the defendant who planned it.  He harbored the grievance that set it in motion; he was the link between his two co-conspirators, Lesly Valentin and Aasim Boone; he coordinated with his co-conspirators before and during the kidnapping; and he orchestrated the violent events so he could collect a ransom.  Nor is this the defendant's first encounter with the criminal justice system.  Indeed, the defendant comes before the Court with more than twenty prior convictions, a record that places him among the most persistent recidivists before this Court.  As such, and for the reasons explained below, the government respectfully submits that a sentence of 360 months' imprisonment is appropriate in this case.

I.        Factual and Procedural Background

   A.        The Offense of Conviction

As the Court is aware from presiding over the three-week trial in this matter, and as detailed in the Pre-Sentence Investigation Report ("PSR"), the defendant's conviction arises from the December 9, 2022, abduction of Shaon Khaled.  During that abduction, which extended into the morning hours of December 10, Khaled was threatened at gunpoint, punched, beaten, knocked unconscious, pistol-whipped, burned with a lighter and cigarettes, sliced across the ear, and doused in bleach.  PSR ¶ 10.  The defendant targeted Khaled with his co-defendants in retaliation for the victim's refusal to pay the defendant money that the defendant believed Khaled owed him and in an effort to extort Khaled.  PSR ¶ 6.  The record also established that the defendant believed his and Khaled's mutual friend, Humayen Khan, would pay a ransom for Khaled's release because Khan was known for giving or loaning his friends money without charging interest or asking questions about what the money was for.  See id.

Khan testified at trial and corroborated testimony from Khaled about a financial dispute Khaled had with the defendant and how the defendant blamed Khaled after the defendant was arrested for driving a car with a dealer license plate Khaled had arranged for the defendant to buy.  Khan also testified that after Khaled refused to pay the defendant all of the money that the defendant had demanded, the defendant told Khan, "[h]e better pay me my money or else I'm going to beat him up or something like that."  Tr. at 891.  Khan further testified that when the defendant came to him the night of the kidnapping, he told Khan that Khan should pay a ransom to secure Khaled's release—before any ransom had ever been demanded—and that the defendant told him not to involve the police, before Khan proceeded to contact the police in front of him.  Tr. at 640-41.  Finally, Khan testified that the defendant was repeatedly on the phone while at his house, which Khan found strange, and that despite the fact that call-detail records showed the defendant was communicating with Boone and Valentin, the defendant told Khan that he was talking to "some girl."  Tr. at 641.  Khaled was ultimately released after agreeing to pay the defendant and his co-conspirators money and marijuana.  PSR ¶ 11.  As Khaled testified at trial, upon his release, his kidnappers told him that they would contact him the following Monday to arrange for his payment of the ransom.  Tr. at 94.

That Monday, on December 12, 2022, one of the defendant's co-conspirators, Lesly Valentin, activated a pre-paid cell phone and began sending extortionate texts to the victim's phone, which was in FBI custody.  Specifically, and among other things, Valentin told Khaled to "remember how spicy shit gets" and threatened additional harm on Khaled and his family if Khaled did not deliver $150,000 and 50 pounds of marijuana to him.  PSR ¶ 13.  After the FBI attempted to engage further with Valentin by using Khaled's phone, Valentin communicated with the defendant before ultimately turning off the burner phone and ceasing communications.  PSR ¶ 14.

In sum, the evidence and testimony elicited at trial showed beyond a reasonable doubt that the defendant was actively involved in all material aspects of the conspiracy and was indeed the link between his co-conspirators and the motive behind the ransom.  Text messages and location data show that following an opaque text from the defendant, Valentin met with the defendant and co-defendant Aasim Boone, at the defendant's girlfriend's house the day before

2

the kidnapping.  See PSR ¶ 7.  Throughout the kidnapping, Bruce communicated with his two co-conspirators, Valentin and Boone, while simultaneously monitoring the area for police presence and trying to convince Khaled to pay the ransom.  See PSR ¶¶ 7-8.

###### B.    The Defendant's Indictment and Trial Conviction

On October 24, 2024, a grand jury sitting in the Eastern District of New York returned a fourth superseding indictment, charging the defendant with one count of kidnapping conspiracy, in violation of 18 U.S.C. § 1201(c) (Count One), and one count of attempted witness tampering and obstruction of justice, in violation of 18 U.S.C. §§ 1512(b)(1), 1512(b)(2)(A) and 1512(c)(2) (Count Three).  See ECF No. 126.  On July 10, 2025, a jury found the defendant guilty of kidnapping conspiracy, in violation of 18 U.S.C. § 1201(c) (Count One) and acquitted him on the attempted witness tampering and obstruction of justice charge (Count Three).

###### C.    The Defendant's Criminal History

As reflected in the PSR, the defendant's criminal history is remarkable not only for its length but for what it reveals.  PSR ¶¶ 38-78.  For more than two decades, the defendant repeatedly chose crime over lawful conduct, accumulating more than twenty convictions.  His criminal history demonstrates a persistent, entrenched, and undeterred pattern of criminal conduct.  As detailed in the PSR, the vast majority of his prior convictions involve drug-related offenses and burglaries—including residential burglaries committed alongside one of his co-conspirators in this case, Lesly Valentin.  Id.

### II.    The Sentencing Guidelines

###### A.    Guidelines Calculation

The government agrees with the Guidelines calculation in the PSR, with one exception.  See PSR ¶¶ 27-37.  Specifically, the government agrees that the defendant's base-offense level is 32 (USSG § 2A4.1(a)); he receives a six-level increase for making a ransom demand (USSG § 2A4.1(b)(1)); he receives a two-level increase because the victim sustained serious bodily injury (USSG § 2A4.1(b)(2)(B)); and he receives a two-level role-adjustment increase for coordinating the kidnapping (USSG § 3B1.1(c)).  Based on this calculation, Probation arrived at an adjusted-offense level of 42, which corresponds to an advisory Guidelines range of between 360 months and life imprisonment, since the defendant is in criminal history category VI.  PSR ¶ 99.

Additionally, the government believes the defendant should receive another two-level enhancement because both video evidence and testimony at trial showed that a firearm was used in the kidnapping, see PSR ¶ 8 (noting the abduction was at gunpoint).  USSG § 2A4.1(3). With that additional two-level enhancement, the government submits that the defendant's adjusted offense level is properly calculated at 44, which corresponds to an advisory Guidelines range of life imprisonment.

III.    Applicable Law

The Sentencing Guidelines are advisory, not mandatory.  United States v. Booker, 543 U.S. 220, 258-61 (2005).  However, the Supreme Court held in Booker that the sentencing court must consider the Guidelines in formulating an appropriate sentence.  Id.  In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted).  Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the district court] may not presume that the Guidelines range is reasonable.  [The district court] must make an individualized assessment based on the facts presented."  Id. at 49-50 (citation and footnote omitted).  Those statutory factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "the need for the sentence imposed [] (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant[,]" 18 U.S.C. § 3553(a)(2).

IV.    A Sentence of 360 Months' Imprisonment Is Necessary Here

The Section 3553(a) factors overwhelmingly support a sentence of 360 months' imprisonment.  First, the nature and circumstances of the offense place this case among the most serious violent offenses.  This was not a spontaneous act of violence or a crime that escalated unexpectedly.  The defendant deliberately orchestrated and led a calculated kidnapping to collect a perceived debt, believing that if the victim could not pay, a wealthy mutual acquaintance would do so to secure the victim's release.

Once Khaled was abducted, he was subjected to sustained and extraordinary brutality over the course of more than five hours.  Khaled was repeatedly beaten, pistol-whipped, burned with cigarettes and lighters, doused in bleach, had part of his ear sliced with a knife, and was repeatedly threatened.  These were not isolated assaults committed in the heat of the moment.  They were calculated acts of torture designed to terrorize Khaled, inflict pain, and coerce payment of ransom.  Although the defendant did not personally inflict the physical violence upon Khaled, that fact does not diminish his culpability.  The defendant supplied the motive for the kidnapping, helped coordinate and organize it, remained in communication as the crime unfolded, and deliberately set in motion the brutal violence and torture that followed.  And while the physical injuries were severe, the psychological trauma inflicted by hours of captivity and torture is immeasurable and will likely endure long after the physical wounds have healed.

4

Second, the history and characteristics of the defendant arguably present one of the most concerning pictures. The defendant appears before this Court with more than twenty prior convictions. That is not the record of a person who made a single, tragic mistake; it is the record of a person who has deliberately and repeatedly chosen to break the law, and whom prior encounters with the justice system—arrests, prosecutions, convictions, and sentences alike—have failed to deter. Each of those prior dispositions represented an opportunity for the defendant to correct course. He declined every one of them, and he ultimately escalated to orchestrating the kidnapping and torture at issue here. A record of that nature is powerful evidence that lenient treatment has been tried and has failed, and that only a substantial sentence can adequately account for the defendant's demonstrated unwillingness to conform his conduct to the law. In fact, the defendant's criminal history demonstrates that lengthy terms of imprisonment have repeatedly failed to deter him. Despite serving multiple state prison sentences of four and five years, as well as a six-year sentence, the defendant continued reoffending. See PSR ¶¶ 43-62. Given that history, the defendant's request for a ten-year sentence is untethered to the realities of the defendant's demonstrated recidivism and would fail to satisfy the need for adequate deterrence and protection of the public.

The government does not minimize the profound adversity that the defendant experienced as a child. The defendant's sentencing letter reflects a tragic picture of abandonment, addiction within the home, poverty, abuse, and instability that no child should endure. Those circumstances deserve empathy. They cannot, however, excuse the choices he continued to make well into adulthood. Many individuals endure extraordinarily difficult childhoods without repeatedly engaging in criminal conduct over decades or organizing the violent kidnapping and torture of another human being. The defendant also argues that because he is 42 years-old, a 360 months' sentence would effectively amount to life imprisonment. Def. Ltr. At 2. But the law does not instruct sentencing courts to discount punishment simply because a defendant commits an extraordinarily serious crime in middle age. To the contrary, here, the defendant's age cuts against leniency. This was not youthful immaturity or impulsivity. It was the calculated conduct of an experienced career criminal who organized a violent kidnapping after decades of criminal justice involvement had failed to deter him.

The need for the sentence imposed to reflect the seriousness of the offense likewise weighs heavily in favor of 360 months' imprisonment. Such a sentence reflects the extraordinary seriousness of the offense, promotes respect for the law, and provides just punishment for conduct that involved prolonged captivity, calculated torture, and the use of violence as a tool of extortion. It also serves the critical goal of deterrence. Kidnapping for ransom strikes at the most fundamental sense of personal security. Individuals who contemplate resolving perceived financial disputes through abduction and torture must understand that such conduct will result in severe punishment.

Equally important, a substantial sentence is necessary to protect the public from further crimes by this defendant. His history demonstrates a persistent willingness to commit dangerous offenses, and this case represents a dramatic escalation in both violence and sophistication. The defendant's leadership role in directing others to carry out a prolonged kidnapping and torture underscores that he presents an ongoing danger to the community.

5

Nothing in his criminal history suggests that lesser punishments have deterred him from escalating criminal conduct.

The defendant repeatedly argues that he "has no history of violence." See, e.g., Def. Ltr. At 2. That characterization ignores what burglary represents. Residential burglary is an inherently dangerous offense that invades the sanctity of another person's home and carries an obvious risk of violent confrontation. More importantly, the defendant's criminal history cannot be viewed in isolation from the instant offense. Whatever distinction the defendant attempts to draw between prior convictions and the present case disappears in light of the jury's verdict. The defendant progressed from repeated drug and property crimes to organizing the kidnapping and torture of an acquaintance over a perceived debt. He supplied the motive for the kidnapping, chose the victim, recruited and coordinated with his co-conspirators and, after all that, while his co-conspirators tortured the victim, the defendant—with striking composure—went to the vicinity of where the victim had been kidnapped and met with Khan in order to press Khan to pay the ransom and while pretending to have no part in the kidnapping he had orchestrated. That capacity for cold, deliberate manipulation speaks directly to the defendant's culpability and dangerousness. A sentence amounting to little more than the statutory minimum would fail to account for either the defendant's central role or the extraordinary violence that he set in motion.

Furthermore, a sentence of 360 months avoids unwarranted sentencing disparities by recognizing the aggravating features that distinguish this case from a typical kidnapping prosecution. The defendant was not a peripheral participant. He coordinated the scheme, directed its execution, selected the victim based on a perceived debt, and conspired to use prolonged torture to facilitate the extortion of ransom. Those facts place him among the most culpable offenders and warrant a sentence commensurate with that level of responsibility. The defendant urges that a ten-year sentence would avoid unwarranted disparity because a defendant in an unrelated Southern District of New York case received that sentence. Def. Ltr. at 7. That argument fails. The Section 3553(a) factors are directed at national and unwarranted disparities among similarly situated defendants—not at case-by-case comparisons between individual defendants in unrelated prosecutions. See United States v. Stewart, 2024 WL 3517853, at *2 (2d Cir. Jul. 24, 2024) (summary order) (the "primary purpose of Section 3553(a)(6) is 'to minimize *nationwide* disparities'") (quoting United States v. Wills, 476 F.3d 103, 110 (2d Cir. 2007) (emphases added)),[1] Sentencing is an individualized determination that depends on the totality of the circumstances, including the nature of the offense, the defendant's role, criminal history, applicable Guidelines range, statutory penalties and personal characteristics. A single sentence imposed in an unrelated prosecution before a different court, involving a different defendant,

---

[1] The United States Sentencing Commission's Judiciary Sentencing Information ("JSIN") tool compiles national sentencing outcomes using an offender's primary guideline, offense level, criminal history category, and resulting guideline range of imprisonment. In fiscal years 2021–2025, there were 10 defendants who, like the defendant, were sentenced under Guideline § 2A4.1, had an offense level of 43 and a criminal history category of VI (excluding defendants who received a § 5K1.1 substantial assistance departure). All of these defendants received a sentence of imprisonment, the average length of imprisonment imposed was 369 months, and the median length of imprisonment imposed was 438 months.

different offense conduct, different Guidelines calculation, and different procedural posture sheds little light on the appropriate sentence here.

The defendant also requests a downward variance based on the conditions during his incarceration at the MDC.  Def. Ltr. At 8-10.  However, the Court should focus on how any such conditions have affected *him* personally.  See United States v. Idris Dayo Mustapha, No. 23-CR-440 (PKC) (E.D.N.Y.), Sent'g Tr. 33-34 (noting that the court is "not going to be convinced by general descriptions of the conditions at the facility or in the BOP system writ large that a variance is warranted for any particular defendant; rather, I am looking at how those conditions have affected the [] conditions of the incarceration experienced by this defendant").  Other than a vague description of persistent lockdowns, corruption and fear of violence, the defendant does not explain how he has been affected by the conditions at the MDC to such a degree that an extraordinary downward variance is warranted.   It is also important to note that, while incarcerated at the MDC, the defendant continued to demonstrate his disrespect for institutional rules.  Indeed, he incurred a disciplinary infraction for possessing a hazardous tool. PSR ¶ 82.  Rather than demonstrate a commitment to rehabilitation, the record shows that the defendant has continued to engage in prohibited conduct.

V.       Conclusion

For the reasons set forth above, the government requests that the Court impose a sentence of 360 months' imprisonment.  Such a sentence is sufficient, but not greater than necessary, to accomplish the purposes of sentencing while reflecting the exceptional gravity of the defendant's conduct, his extensive criminal history, the danger he poses to the public, and the profound harm inflicted on the victim.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:         _____/s/_____
Joshua B. Dugan
Lorena Michelen
Andrew D. Wang
Assistant U.S. Attorneys
(718) 254-7000

cc:     Clerk of the Court (RPK) (by ECF)
        Defense Counsel of Record (by ECF)